CHARLES KROON, Appellant, v. SHERMAN JONES et al., Appellees.

**DRAINS:** Establishment—River-Control Districts. Districts may constitutionally be established for the construction therein of embankments, revetments, and retards along river banks in order

to prevent the erosion of said banks when it is shown that the benefits resulting from such undertaking will not be confined *solely to the lands abutting upon the river,* but will, to an appreciable extent, conserve the proper drainage of all the lands throughout the district.

*Appeal from Mills District Court.*—EARL PETERS, Judge.

## DECEMBER 11, 1924.

THIS is an appeal from a decree and order by the district court affirming on appeal the action of the board of supervisors in establishing a district for river control and the protection and improvement of agricultural lands.—*Affirmed.*

*Genung & Genung,* for appellant.

*C. H. Cook* and *J. J. Hess,* for appellees.

VERMILION, J.—Section 1989-a1, Code Supplement, 1913, is as follows:

"The board of supervisors of any county shall have jurisdiction, power and authority at any regular, special or adjourned session, to establish a drainage district or districts, and to locate and establish levees, and cause to be constructed as hereinafter provided any levee, ditch, drain or watercourse, or to straighten, widen, deepen or change any natural watercourse, in such county, whenever the same will be of public utility or conducive to the public health, convenience or welfare, and the drainage of surface waters from agricultural lands shall be considered a public benefit and conducive to the public health, convenience, utility and welfare."

The thirty-ninth general assembly (Chapter 45) amended that section by adding the following:

"For the purposes of this chapter the word 'levee' shall be construed to include in addition to its ordinary and accepted meaning embankments, revetments, retards or any other approved system of construction which may be deemed necessary adequately to protect the banks of any river or stream, within or adjacent to any county, from wash, cutting or erosion, and the

provisions of this chapter shall be liberally construed to promote, embrace and authorize the drainage, reclamation or protection of wet and overflowed lands, or lands endangered, or liable to be endangered by wash, cutting or erosion, within this state, and the preservation and maintenance of such works whether heretofore or hereafter constructed.''

These statutes are now embodied in Sections 7421, 7422, and 7423, Code of 1924.

The board of supervisors of Mills County, acting upon a petition of property owners and the report of a commissioner appointed to investigate the matter, and upon a finding that the proposed work, when constructed, would be conducive to public health, convenience, and welfare, in 1922 established a ''district for river control and the protection and improvement of agricultural lands, to be known as Missouri River District No. 1.'' From this action by the board, the appellant, who owns land in the proposed district, prosecuted an appeal to the district court, where the action of the board was affirmed; and from that order the present appeal was taken. No question is raised as to the regularity of the proceedings. The attack is upon the right to make the proposed improvement at all, and two propositions are presented. The first relates to the constitutionality of the act of the thirty-ninth general assembly amending Section 1989-a1; the second, to the legality or constitutionality of the exercise by the board of supervisors, in the instant case, of the power so conferred.

The improvement proposed is the placing of retards, consisting of untrimmed trees formed into large mats, in the Missouri River, to deflect the current and protect the bank from erosion. It is said in argument that the only thing the amendment to Section 1989-a1 seeks to do, and the only thing the evidence shows the proposed improvement will accomplish, is to prevent erosion of the bank of the river; and that this is a private matter, affecting only the land lying along the river and subject to erosion. We cannot agree with counsel that this is the only purpose of the statute, or that it is the only effect of the proposed improvement.

It is contended that the act of the thirty-ninth general assembly is in contravention of the constitutional provisions pro-

hibiting the taking of private property for public use without just compensation, and authorizes the taking of private property for a purpose and use not of a public character. The precise contention is that the amendment in question does not in terms declare that the improvements therein authorized shall be considered a public benefit, and conducive to the public health, convenience, and welfare. If it should be conceded that such a legislative declaration of public benefit is essential to the validity of the act, still appellant's contention cannot be sustained. The act in question is an amendment of a statute that authorized the board of supervisors to establish drainage districts, to locate and establish levees, to straighten any natural watercourse, and to do the other things there enumerated, when to do so would be of public utility, or conducive to the public health, convenience, or welfare, and which declared that the drainage of surface waters from agricultural lands should be considered a public benefit, and conducive to the public health, convenience, utility, and welfare. The amendment provides that certain other enumerated things may be done, as the building of embankments, revetments, and retards, and the use of any other approved system of construction deemed necessary adequately to protect the banks of any river or stream from wash or erosion; and that the provisions of the chapter in which the section amended is found, shall be construed to embrace and authorize, among other things, the protection of lands endangered or liable to be endangered by wash, cutting, or erosion.

The plain import of the amendment is to provide authority to do other things, not enumerated in the original act, for the original purpose and in the manner originally prescribed. That it does so by broadening the meaning to be given to the word "levees," and providing that the banks of rivers may be protected from erosion, is not an attempt to confer authority to do at public expense work that is not of public utility and is not conducive to the public health, convenience, or welfare. While it may be that, in some instances, the prevention of erosion of the banks of a river would be of benefit only to the land thus being diminished in area, and that an attempt at prevention under the statute and at public expense could not be sustained

as a proper exercise of the power conferred, that fact no more affects the constitutionality of the act that provides for such prevention when it will be of public utility than would the obvious fact that a given ditch may benefit only the land of a single individual affect the validity of statutes providing for the construction at public expense of ditches, where the result will be a public benefit. In other words, the fact that there might be work of a like character done that would not be of public utility, does not require us to hold unconstitutional a statute authorizing such work to be done at public expense when it is of benefit to the public. Nor does the fact that a work public in character may result in incidental benefits to some that are not enjoyed by all, afford a basis for objection on constitutional grounds. If, to some appreciable extent, a proposed improvement will result in benefit to the members of the community as such, not merely as individuals, constitutional requirements are met. It is not necessary that all be benefited alike or in the same degree. *Sisson v. Board of Supervisors,* 128 Iowa 442. The statute as amended authorizes work of the character there designated to be done in the manner prescribed, whenever it will be of utility or conducive to the public health, convenience, or welfare, and is not unconstitutional.

The district comprises over 7,000 acres of land, is 7 miles long, and varies in width from 1 to 3 miles. There are about 9 miles of river front in the district. Since the original survey of the river, in 1851, about 2,400 acres have been washed away and lost by erosion within the boundaries of the district, 1,400 acres of which have been so destroyed since 1895. The extent to which erosion, if not prevented, would take place in the future, is, of course, uncertain. The river has moved three quarters of a mile to the east within the district since 1895. It has been known to so move as much as a quarter of a mile in a single year, at a point outside the district, where the soil is similar to that within the district. The river bank, where it has not been subject to erosion, is higher than the bottom lands back from the river. Within the district there are now some levees along the bank of the river that were constructed by private enterprise, and that protect a portion of the land from the flood waters of the river, to some extent. The erosion, if

not stopped, will eventually cut into these levees, and their usefulness be destroyed. One of them is less than a hundred feet from the present bank of the river. If the erosion can be stopped so that a permanent bank can be preserved, other levees can be constructed that will afford further protection from flood waters. The land within the district is all bottom land, and it is the opinion of engineers that it has all at some time been occupied by the bed of the river. The river has for many years been cutting into the bank from a point some three quarters of a mile below the upper end of the district to a point about a mile and a half above the lower end, and has formed two bends to the east, about two miles apart. The bank at one of these bends is now within a mile of the boundary of the district, and three quarters of a mile from where it was in 1895. The natural tendency is for the river to continue to undermine and wash away the bank at the bends. While, of course, only the land at the river bank is subject to present erosion, other land is exposed to that danger as the erosion proceeds. The extent to which this may go if not stopped by natural processes or prevented by artificial means must be largely conjectural, and depends upon the notoriously uncertain action of one of the great rivers of the earth, draining a vast area and flowing through a wide valley having an alluvial and easily eroded soil, where it has in the past been constantly changing its channel. The liability of the land within the district to erosion by further encroachments of the river varies, of course, as its distance from the river, and according to whether it lies in the probable path of the river's movement. But there seems to be nothing in the nature of the soil or the topography of the land within the district that would counteract the present natural tendency of the river to wash away the bank to the east.

Aside from actual erosion, to which practically all of the land is more or less in danger from further extension of the present movement of the river channel, unless it can be prevented, it is all subject to overflow at times of flood. The tendency of the river to form bends in the channel, and to extend the bends by erosion, is shown to increase the danger of floods by the cutting away of the higher ground at the river bank, and

the direction of the current at such points. These facts are either not disputed or are fairly established by the evidence.

The extent to which the method proposed will be successful in preventing the erosion of the bank and controlling the destructive force of the river cannot be foretold with certainty. It has the approval of engineers of experience in such work.

It is quite clear, we think, that the benefit to be naturally expected from the proposed improvement is not confined to the land immediately at the river bank, which will be protected from actual present destruction by erosion, but that there is a very appreciable benefit to the lands in the district generally. This results, not only from the fact that the improvement will, in the proportion that it is successful in preventing erosion and checking the movement of the river channel to the east, remove the danger of the destruction of the land by future encroachments of the river, but by lessening the danger to be apprehended from high waters, protecting the present levees, and creating a condition that will enable further work of that character to be carried out. In short, from a careful examination of the record, we are satisfied that the proposed improvement comes within the purview of the statute; that it is of public utility and conducive to the public health, convenience, and welfare.

It follows that the judgment should be, and it is,— *Affirmed.*

ARTHUR, C. J., and EVANS and STEVENS, JJ., concur.